and formed all parties are here, but we start our day with the motion calendar, a motion that's being argued. United States v. Shor and Ahuja. Thank you. Good morning. Good morning. May it please the court. My name is Alexandra Shapiro and I represent Appellant Annalesh Ahuja. May I reserve one minute for rebuttal, Your Honor? Yes, you may. Thank you. It is undisputed in this matter that Mr. Ahuja poses no risk of flight or danger to the community, so the sole issue for the Court is whether his appeal presents a substantial question of fact or law that would result in reversal or a new trial. We have two such substantial questions, and he is entitled to bail. The first one is whether there is a confrontation clause violation when the district court precludes all recross on new matter elicited for the first time on redirect examination. Seven other circuits have held that in such a case there is a confrontation clause violation, and therefore, and we're not aware of any circuit that's held to the contrary. Well, that's a very dramatic way of putting it. The government maintains, and I think with some support in the record, that the judge did not preclude all recross. She said, I have a general practice of not wanting to have recross, but I'll consider what comes up on a case-by-case basis. And then there were several specific instances where one or the other defendant, or particularly your client, sought a recross, and the judge ruled not to have a recross, and so the judge ruled no. So shouldn't we just be talking about whether in these particular instances there was an abuse of the district court's discretion to control the recross, and maybe there was? Absolutely not, Your Honor, for two reasons. First of all, the government has completely mischaracterized the record. If you actually read the transcript excerpts, it's quite clear that the district court repeatedly said that she had a rule, a policy. She said the first time this came up, at transcript 1232, she said, I don't permit recross. Defense counsel then explained why he wanted recross, including mentioning subject matters that had come up in Mr. Dole's redirect that had not been outside the scope of the cross. And so don't we want to be focused, for example, on that? Because even if there was some sort of prejudice against recross, the district judge has the authority to manage the proceedings. So the question is, was there some prejudice from not getting recross? Well, Your Honor, if I could, I'd like to address that, but I do want to make one other point, which is that I think the record bears out that it's clear that the judge said it was her rule that she said not for the reasons you described repeatedly when counsel described the fact that new matter had come up on redirect. And what these other seven circumstances found was that she said not for the reasons you described, she's making a determination based on the request for recross that there isn't a justification in that instance, right? No, I don't think so, Your Honor, because it came up several times, and it was quite – and that's what she said each time. She never gave any indication on what reasons would support recross. But why don't we talk about – excuse me. Why don't we talk about, pick your best one. Yes. Pick the best one and explain why it is important that there had been recross on that issue. The most significant, and we think they're all significant, but the most significant by far was what happened during Mr. Dole's redirect that we were not allowed to recross on. And it specifically – there were two topics, but the most significant one was his mention of this concept of Shor's guys, and that Mr. Ahuja had supposedly – had knowledge that Mr. Shor supposedly had guys who – or a guy who was a corrupt broker. That was – the key issue in the case was whether Mr. Ahuja was aware of this. The jury not only asked for this – Mr. Dole's testimony, but asked for highlights relating to Shor's guys. In addition to that piece of evidence, there were two exhibits that came in on Mr. Danushi's redirect that we never had a chance to recross on. The jury asked for those exhibits. Did you object to the entry of the exhibits? The – we did not. We asked for recross that was denied. But there's no requirement that you object to the – the – Were the exhibits within the scope of the direct? No, Your Honor. They were out – this was all outside the scope. This was not introduced on direct. It was a response to something that happened in the cross. I understand the point about Shor's guys, that in the transcript it seems like the lawyers are taken by surprise about the policy against recross. But then at page 1237 of the transcript, Mr. Rizumna, who I guess is Shor's attorney, says, well, if we can't do recross, we're going to object more aggressively when things are outside the scope. Were there objections to the exhibits being outside the scope? There weren't objections to those particular exhibits. But let's just go back to Shor's guys. I respectfully submit that's enough to show that the government can't prove harmlessness beyond a reasonable doubt. The jury focused on the issue. The government mentioned this no less than six times in the summation. What's more, the Supreme Court in Delaware v. Van Arsdale, with Chief Justice Rehnquist writing for the Court, said that the harmless error inquiries, whether assuming that the damaging potential of cross were fully realized, the reviewing court could say that the error was harmless beyond a reasonable doubt. And I respectfully submit there's no way you can say that when the jury clearly focused on the issue, the government argued it in summation, and the central issue in the case was whether Mr. Ahuja had knowledge of this alleged mismarking. Thank you. Your time has expired. Thank you, Your Honor. We'll hear from the whole counsel representing Mr. Shor, is it? Good morning, Your Honor. Yes, that's correct. May it please the Court, my name is Justin Weddle. I represent Jeremy Shor on appeal. I did not represent Mr. Shor below. I also would request that I be permitted to reserve one minute for rebuttal. You may. Just as with Mr. Ahuja, there's no dispute about any risk of flight or danger to the community, or that the appeal is for purposes of delay. The only issue here is whether there are substantial questions. And we've joined in Mr. Ahuja's two questions explained in Mr. Ahuja's motion, and we've also explained two in our motion, and we submit that they are substantial questions. Mr. Shor's defense was that he worked at premium point. He believed that the valuations were within the realm of reasonableness. And when they started to become further and further from where he saw the trading in the market, he did what he could to try to stop what was happening. This defense was based on a lack of intent to defraud, lack of the specific intent to defraud, and a lack of a conspiratorial intent. As part of that, he attempted to prove that he recorded on his own volition, secretly, conversations with people at premium point, in which he said, the marks are high, the marks are 8 or 9% above where I see the market. We're high. And they also captured certain statements by his co-conspirators to him. And for example, when he says to Mejidi, the marks are high, Mejidi, his supervisor, his boss, and his purported co-conspirator, doesn't say, of course the marks are high, we're conspiring. The district court thinks that this evidence is hearsay, right? Because it's really only beneficial to Mr. So why do you think the district court is wrong? It's simply not the case that they're hearsay. And I would urge the court to take a look at the excerpts. They're included in Exhibit 11. You're going to say they're not offered for the truth because when he says the marks are high, he's not offering it to prove that the marks are high. Correct. He's offering it to show his own state of mind. That he was not. But it's his own state of mind that he is representing, in effect, to the person he's speaking to, right? I mean, these are self-serving recordings. They're not, respectfully, Your Honor. He's not saying, I don't understand valuation. I just go along with what you people say. He's not saying, this stuff is so complicated. He's not saying, I believe these marks to be accurate. Those might be thought of as self-serving statements. These are statements where he says, the marks are higher than where I'm trading in the market. The market is 10% down. That's not a self-serving statement. It's not a statement about his state of mind. It's a statement about the market not offered to prove where the market is. That's the government's case. And because that's the government's case, there would be no unfair prejudice. Let me start from, let me take a step back. He's offering it not for its truth. But those statements are not subject to cross-examination. They're not offered for their truth, and therefore, they're outside the rule against hearsay. Sometimes- They're not subject to cross-examination. I mean, this whole thing that he's conducted, these conversations, are being offered to avoid his testimony about it. That's not correct, Your Honor. These are real-time recordings of his interactions with people at premium point. Like, if we flip this over and think of it from the other side, in every case where the government has recordings, they play the recordings. Because that's the best evidence of how these people are interacting. And it shows a lot about their relationship, their conduct, the things they say to each other, whether they have conspiratorial intent, whether they have that kind of relationship. And- And because those are statements of a party opponent. And these are statements of the party himself. But they're not offered for their truth. And I think that sometimes- The fact that he talked to the compliance officer that you're offering it for, it sounds like you're saying it's relevant more because of the substance of the interaction or what he was saying. It's relevant for both purposes. The compliance officer came in- So if it's admissible for the mere fact that he had this conversation, how does that support your case? Like, how is that probative of his- Because, well, to take the compliance officer example, a normal co-conspirator doesn't go to a closed door meeting with the compliance officer and say, there are levers, there are ways to fudge the valuation. We're getting pressure from a partner. That is, we could argue about it. The jury might decide, well, this is a weird co-conspirator. He did something weird. But we are entitled to prove, as part of our defense, that he did things that co-conspirators may not typically do. And we're entitled to put that in front of the jury and make an argument about it. The government blocked that defense. And the district court played along with it. And the statements were not offered for their truth. In fact, the government opened on the fact that Majidi was pressuring partners. So sometimes when statements are not offered for their truth, they're nevertheless excluded because of the risk that the jury might take them for their truth, which would be unfairly prejudicial. There's no unfair prejudice to the government if the jury were to take these statements for their truth, because they prove the government's case. They were essentially a concession by Jeremy Shore that he knew the valuations were off the market. So he's conceding knowledge in order to put on a defense of no intent. And that defense was completely blocked by the government. Thank you. Thank you. We'll hear from the government. Good morning. May it please the court. My name is Max Nicholas. I represent the government on this appeal, and I was one of the attorneys representing the government at the trial below. If it's okay with the court, I'll start by responding to Counsel for Ahuja's point on the recross issue, and particularly the issue of Ashish Dole's testimony. I think just putting this in a little bit of context is important with respect to the quote, unquote, Shore's guys or Shore's boys point. So this was a six-week trial, and I think the majority of the trial, and if not the majority, a huge percentage of the trial was cross of cooperating witnesses. And I believe that the cross examination to Mr. Dole was two or two and a half days. On cross examination, Dole was examined thoroughly, skillfully, and extensively on Ahuja's knowledge of the fraud, Ahuja's conversations with Dole about the fraud, their discussions about how the fraud worked. So the notion that the district judge violated her discretion by considering that a line about Shore's boys was not substantively new, was not a departure from what had been substantively discussed already in direct and cross is incorrect. That was not a violation of Judge Vaila's discretion. Second of all ---- Roberts. Did the district court make a determination that it's not substantively new? I mean, that's the question, isn't it? Well, I think the district court evaluated the request for recross as they arose. She had our understanding from both her remarks prior to the commencement of the actual evidence, when she was instructing the jury, and as these things came up, was that she had a general ---- a general policy, I think was her way of putting it, against recross, but that she would consider cases ---- Would she allow any recross in, in this case? Your Honor, she offered Mr. Ahuja recross of a government ---- an investor witness, a victim witness, and the defense, for strategic reasons that I'm sure made sense, declined to do it. The allegation is that the government took advantage of the judge's stated policy and introduced new materials in ---- on cross. Your Honor, respectfully, the government did not take advantage of any policy. The government did no such thing. The government simply used redirect to respond within the scope to what was elicited on cross-examination. And in fact, that's a good segue into a question that I wanted to answer. Judge Pooler asked during the colloquy with counsel for Mr. Ahuja of whether the exhibits that came in during Mr. DiNucci's redirect were in the scope of his cross. And the answer to that is, yes, they were. During the scope of Mr. DiNucci's cross, he was asked over and over about whether Jeremy Shore ever ---- who Jeremy Shore meant when he referred to his boss, whether it was me, Mejidi, or Mr. Ahuja. And he was ---- and this is all laid out in the briefing. He was ---- counsel for Mr. Ahuja continually challenged Mr. DiNucci and tried to make the point to the jury that he only ever met Mr. Mejidi, he couldn't have met Mr. Ahuja. Mr. Ahuja wasn't really who he meant by his boss. So to introduce an exhibit in response to that, that supports the testimony that had already been given on direct and on cross that Mr. DiNucci considered both Mr. Ahuja and Mr. Mejidi, his bosses, is plainly within the scope of the direct. And the district court needs the ability to ---- Kennedy, what about those documents themselves? In effect, can't they be cross-examined? Once these documents are introduced, maybe there's another take on what those documents mean. Why shouldn't the defense have an opportunity to ask about those specific documents? In other words, the sequence is, yes, the witness testifies, this is what the situation was, this is what Mr. Ahuja knew and so on, this is what the boss meant. Then there's cross-examination. No, it isn't. No, it isn't. No, it isn't. And he maintains his story. On redirect, the government says, aha, and lays down a trump, that here we've got a document that shows that this is what it means. That's a pretty big deal, isn't it? It's not that it's improper. It's not that it's beyond the scope of the cross. But then why shouldn't the defense have an opportunity to query? Wait a minute. Let's read this line by line, word by word, and put whatever questions they might have about what the document means. The document is new. Your Honor, I don't think that the ---- I don't think that the document was a trump of any kind. I think the document was ---- Maybe it's a deuce of trumps. You know, it's a little trump. That's why the government offers it, is because it bolsters the direct. It refutes the cross. But if it's only ---- if it's not a real trump, if it's only a deuce, maybe they've got a three. Well, Your Honor, to that respect, what I would say is that is the function of redirect. Redirect is always going to attempt to reset cross to get back to the points elicited on direct. And so I think it is not the law, nor could it be, that any time the redirect is not a simple, simply a replication of what was literally already put before the jury and stated on direct, then you have recross. The trial would go on forever. I think it was within Judge Fela's discretion. This is a ---- this is ---- I've tried many a case, as a lawyer, as a judge, and there's usually recross, and the trial somehow comes to an end. I'm not still trying those cases from years ago today. And they come to an end, because usually there's direct, then there's cross. The cross typically is longer than the direct in a criminal case. Then there's redirect, briefer. Then there's recross, briefer. Sometimes the government gets up and asks for, we want reredirect. And the judge probably says no, because sooner or later it does have to end. But it strikes me that this is ---- there's a certain excess in saying we're never going to have recross if that's what was said and what the practice was. Well, Your Honor, I don't think that Judge Fela said we are never going to have recross. I think she exercised discretion on the factual issue with ---- in this instance and in the case of Mr. Dole's examination, she exercised her discretion on the factual issue of is recross necessary here? Is there material that is substantively new from what has already been discussed on the direct and the cross? And I don't think, particularly if one keeps in mind how ---- and I totally agree there's nothing wrong with this. But if one keeps in mind how unbelievably prodigious the cross examinations were of these cooperating witnesses, I think it was completely within the judge's discretion to say, I'm not letting this become jarndice versus jarndice. This trial has to end at some point. Cross has taken forever and has been extremely thorough, has probed with extreme clarity and pointedness whether ---- you know, Mr. DiNucci's knowledge of whether or not Schor actually meant Ahuja, Mr. Dole's knowledge of whether or not Mr. Ahuja was actually in on the fraud, these things were probed ad nauseam. And I don't mean that in a pejorative way. I mean it as a compliment to the defense, the skill of the defense lawyers in this case. If they did throw up, that's a pretty good compliment. There was just ---- Right. Exactly, Your Honor. There is ---- What about ---- can we get to the recordings? Yes, Your Honor. So Schor wants to introduce the recordings not because he wants to say that he knew that the marks were out of the market range, but to show that he went to the compliance officer and somebody who was involved in the conspiracy doesn't do that. So why is that not relevant evidence and why shouldn't that have come in? Your Honor, a couple of responses to that. First of all, the compliance recording that Mr. Weddle raised came in. That's the December 15th recording with Evan Jay. We let that in. The whole ---- so, and the question is an interesting one because he, below, counsel for Mr. Schor referred to that recording, the compliance recording, I think for the reasons Your Honor is bringing up, as his quote, unquote, chief recording. That's the one he really wanted in. We consented to that coming in. The whole point of consenting was to resolve this issue. You consented to it after the district court decided that all of it was hearsay. So I'm asking, was that the right determination? I mean, if he's saying it should come in not because I care about the truth of what he's saying on the recordings, but for the fact of the conversation, that it, you know, shows whether he was involved in the conspiracy or not, why shouldn't that come in for that reason? Your Honor, the district court's ruling that it was hearsay was correct. The statements were self-serving. So, for example, when one looks at the transcript, the transcripts are self-serving. It's not so you're saying that it could prejudice the jury if the self-serving statements come in, but you're not saying that he wants to admit it for the truth of the self-serving statements? No, I think, Your Honor, respectfully, I think that that is, that was the functional purpose of why they wanted it in. For example, the statements included things, and I'm not quoting word for word, I want to be clear, but the substance of the statements included things like Mr. Schor saying, well, it's a gray area. That, that, that, that is a self-serving statement made when he alone knows that he's recording himself, and, you know, he can then hold that up to the jury and say, gray area. That's not consistent with the jury charge. Jury charge is I knew I was doing something wrong. Here in this tape that I secretly knew I was recording, I said gray area. So I think the district court's ruling was absolutely right. In order to avoid the- Sotomayor He doesn't want to say to the court that it's a gray area, right? He wants to say, I went to the compliance officer and had this conversation, and it shows at the time I thought it was a gray area. I was worried about it. I wasn't really sure what was going on. And so, and so somebody who's conspiring to do the thing doesn't do that. So, so we're not actually, he's not actually admitting it for the truth of the idea that it's a gray area, right? Your Honor, I think, I think that he is. I think the substance of what was said on the recording is the reason he wanted to put it before the jury. And I think the mere fact of secretly recording oneself would not be relevant to guilt or innocence one way or the other without the substance of what was being said. But in any event, we let that chief recording in. And in any event, this issue of the recordings, in our view, has been waived. And we believe it is a true waiver. They made an explicit agreement that what we're doing right now would not be happening because of what we did. We took extreme pains in the district court, and so did Judge Vaila, and so did counsel for sure, to try to be clear about the agreement that had been reached. And it is what it is. We're doing it anyway. But the issue has been, the issue has been waived. In any event, the recordings are classic hearsay. Thank you, counsel. Thank you very much. Counsel, when is Mr. Adua's point date to appear in person? I believe it's March 27th, Your Honor. I just have three quick points. First, most importantly, the sole question for this Court is whether we've presented a substantial question. We don't need to show that we're going to win on the merits. That's for the merits panel. And secondly, with regard to whether the district court was exercising discretion, she said repeatedly things along the lines, it is my rule, I don't allow cross. And in the reply papers at footnote 4, we've cited a number of other cases in which the same district judge has said the same thing. I think it's fair to say it is her rule and her policy. And you can't the cases make clear that discretion only comes into play once there is an opportunity to cross-examine on the particular matter. Lastly, I do want to reemphasize the point about Shor's guise. My adversary tries to say that Dole and the other cooperators were thoroughly cross-examined as to the and that is true as to the matters that came up on direct. It is not true as to the Shor's guise or those two exhibits that came up on Danucci's. And with respect to Shor's guise, there was no document corroborating the testimony of Dole or Mishidi, the one of the other cooperators who the district judge said was thoroughly impeached, indicating that Mr. Ahuja had any knowledge of that corrupt so-called corrupt broker. Thank you. Does Mr. Shor have the same report date? Yes, he does, Your Honor, March 27th. Your Honor, the discussion about the gray area was admitted. That's from the compliance tape, and so that came in. I think what's critical about the curtailment that was placed on the use of the recordings is that the government was able to, instead of What about the fact that the main thing that Mr. Nicholas argued, it seemed to me, was not so much the merits of this, but was the waiver, and there was a discussion after the fact. The defense could have stood on its objection and said, aha, we've got a great appellate issue, but instead a deal was struck, and the judge asked several times, does this put an end to this issue? Has this been decided now that this is coming in and the rest is staying out? And the answer was yes, yes, yes. Why isn't that a waiver of the appellate issue? Four things, Your Honor. Mr. Nicholas said that it was a true waiver. The government waived the true waiver argument, and we've put that on a footnote in our brief. So I think even if there was a waiver, we're in plain error review, and I think it's easily satisfied here, because the tapes were not hearsay, they were not offered for their truth. Wait. Where did they waive the waiver? In their opposition to our motion for bail, they argued that because of the colloquy that had taken place in the district court, the exclusion of the tape recordings was subject to plain error review. So we're not in the realm of a true waiver, we're in a forfeiture realm. And they've waived the argument that we're in the realm of true waiver. And so Mr. Nicholas just said that at oral argument. Are you arguing that they've now given that up for purposes of the merits panel? That's an interesting question that I have not considered, Your Honor. But if they haven't, then how does it become a waiver for us, because we're supposed to be predicting is this a substantial issue for the merits panel? Right. But that's a substantial issue in itself, whether there's a waiver or not. I think it actually is a substantial issue in itself, is the whole import of this waiver colloquy. On whether there's a valid and effective waiver, I have three responses. The first is that the decision had already been made and it was final. Under the rules of evidence, that decision was conclusive and preserved for appeal before any discussion of waiver occurred. Second, the purported waiver was not voluntary, because under the circumstances in which it was extracted, the district judge had conclusively ruled no recordings are coming in and then started to bargain with Mr. Shor's counsel about his appellate rights. I think in those circumstances, it's not a voluntary waiver when basically someone's being told you're going to have no defense or you can have a small morsel of your defense if you give up appellate rights. Third, Mr. Shor's counsel expressly reserved the right to use 25 identified excerpts of the tapes that spanned a multi-month period of time. They're set forth in his letter, which is ECF 199, it's Exhibit 11, which is attached to our reply brief. Those statements are clearly not offered for their truth, and Mr. Shor was blocked from using them. The critical difference that took place, therefore, was that the government was able to argue, based on completely inadmissible hearsay that was admitted not for its truth with a limiting instruction, but then the government in summation expressly relied on it for its truth, they were able to argue that there was a single episode of Mr. Shor complaining about the marks on December 15th, 2015, and that it was related to his bonus. That is false. It's not what happened. What happened is that Mr. Shor was complaining about the marks from the middle of 2015 through the time that he left Premium Point, and if he had been permitted to admit and use the excerpts that had been identified in his letter with his cross of Majidi, he would have showed a multi-month period of time in which he repeatedly said, the market is 8% down, the market is 9% down. I see this portfolio is 5% off. You describe using them for the truth of what was said. No, I'm not describing, no, that's not. That's what you, I'm just taking from what you just said. No, he would have been able to argue that for months, long before bonus season, Mr. Shor complained and spoke to both conspirators and non-conspirators alike about the fact that where he saw the trades was substantially below where the valuations were. That was not offered for its truth. He could have been wrong, right? What if he was just not very good at valuing things, or not very good at reading the market, and he was wrong, and the market was 40% down, or the market was up 5%? Either way, he was not engaged in a mismarking conspiracy, or he was entitled to put in that he was not engaged with specific intent to defraud in a mismarking conspiracy with these people that he kept saying the valuations are off. All right. Thank you. Thank you. Thank you all. We'll resume the decision mindful of the date of report for these two defendants. Thank you.